IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
Civil Action No.: 1:25-cv-176

| LAMB WESTON, INC., | Hon. Chief Judge Catherine C. Eagles |
|---|---|
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| IVAN MERCADO, | |
| Defendants, | |

Lamb Weston, Inc. ("Lamb Weston" or "Company"), brings this Amended Complaint against Ivan Mercado ("Mercado"), and states as follows.

## INTRODUCTION

1. This action arises out of Mercado's brazen, unlawful disclosure of Lamb Weston's confidential information during an interview (the "Interview") with third-party Third Bridge Group Limited ("Third Bridge"), published online and available for purchase on Third Bridge's website, after Mercado's termination from the Company. Mercado shared Lamb Weston's confidential information during this Interview despite executing a Separation Agreement with Lamb Weston, pursuant to which he received hundreds of thousands of dollars in benefits in exchange for—among other things—agreeing **to not** "disclose . . . 'Confidential Information' related to Lamb Weston." Moreover, during the Interview, Mercado offered to share further information from his "files" on Lamb Weston in future discussions regarding the "impact of lower capacity utilization and its direct impacts on [Lamb Weston's] operating costs and overall margins" (i.e., further confidential information), and the Interview closed by noting that members of the

1

public could seek private meetings with Mercado—presumably to elicit further confidential information about Lamb Weston.

2. Investigation by Lamb Weston since learning of the Interview has confirmed that Mercado learned about a week before his termination from Lamb Weston that he would soon be terminated, and then almost immediately began emailing numerous confidential Company documents to his personal email address from his work email address, including files discussing precisely the confidential information that he later disclosed during the Interview.

3. Third Bridge's website states that it offers compensation to its "specialists" for "every engagement," and Mercado admitted in his Answer to Lamb Weston's initial Complaint in this case that he received financial compensation for his participation in the Interview—thus not only breaching his obligations to Lamb Weston, but enriching himself by extracting additional payments for his wrongful disclosures.

4. Mercado's wrongful disclosure of Lamb Weston's confidential information constituted a gross and willful breach of his Separation Agreement, violated the law, and has already caused irreparable harm. And the imminent threat that he will continue to disclose such information, including potentially additional information from his Lamb Weston "files," threatens future and additional irreparable injury.

5. Lamb Weston's initial Complaint thus sought (and this Court has already granted on the consent of all parties) immediate injunctive relief directing Mercado (a) not to further breach the Separation Agreement by using or disclosing Lamb Weston's confidential information and (b) to immediately return of all of Lamb Weston's property, including company files that Lamb Weston's investigation shows he wrongfully absconded with, and which he has publicly stated he maintained after his departure from the company (despite expressly agreeing not to do so). If for

any reason that pending injunction were to be lifted, Lamb Weston will seek additional, preliminary injunctive relief of the same type, and in all events will seek permanent injunctive relief in this case. Lamb Weston also seeks an award of damages to hold Mercado accountable for his blatant violation of the Separation Agreement, his fraudulent misrepresentations to Lamb Weston, and his unlawful and unfair disclosure of Lamb Weston's confidential information.

## PARTIES, JURISDICTION, AND VENUE

6. Lamb Weston is the number one supplier of value-added frozen potato products in North America and is a leading supplier of value-added frozen potato products internationally. Lamb Weston is incorporated under the laws of Delaware and has a principal place of business in Eagle, Idaho.

7. Defendant Mercado is a former employee of Lamb Weston. During his approximately four-year tenure, Mercado worked as Vice President of Global Customer Service, Logistics and Planning. Mercado is currently domiciled in Greensboro, North Carolina.

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because Lamb Weston and Mercado are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Mercado because he is domiciled in North Carolina and, therefore, is a North Carolina citizen.

10. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because, on information and belief, Mercado resides in this judicial district.

## STATEMENT OF FACTS

A. **Mercado's Employment at Lamb Weston**

11. Mercado served as a Vice President of Global Customer Service, Logistics and Planning, at Lamb Weston for almost four years—beginning in or around October 2020 and ending

3

in April 2024. In that role, he had global responsibility for managing the product supply of finished goods, which included planning, allocation, disposition and material sourcing administration to further Lamb Weston's business sales objectives and corporate inventory targets. His responsibilities included, among other things, developing and leading overall supply planning strategy, processes, policies and procedures across the Company's Supply Chain network. He also served as a liaison between various key groups within the Company; was intimately engaged with the Company's product supply status and overall business performance; and worked on matters concerning demand forecasts, product supply plans, costs of goods, new product introductions, supplier performance, and inventory management based on Company deployment strategy.

12. As part of his role and responsibilities, Mercado became privy to, and obtained possession of, highly confidential information from and about Lamb Weston, including information regarding its market strategy; pricing and pricing strategies; customers and customer strategies; manufacturing equipment, facilities, and capabilities; and other highly confidential information.

13. Throughout Mercado's tenure at Lamb Weston, the company made efforts to protect such confidential information. This started from the time of his onboarding at the company—he received training on, and acknowledged his duty to comply with, Lamb Weston's Code of Conduct (including confidentiality obligations) and Information Security Policy in the first weeks of his employment. Indeed, throughout his tenure at Lamb Weston, Mercado knew of and participated in such efforts, including participating in multiple trainings regarding Lamb Weston's Code of Conduct (which included confidentiality obligations) and Information Security Policy (which required the return of confidential information and work papers), and acknowledging his confidentiality obligations in writing in several documents.

4

14. For example, during his employment, Mercado attended five training courses specifically directed toward Lamb Weston's Code of Conduct—annually from 2020 to 2024. All relevant versions of this Code of Conduct include a section entitled "Proper use of Confidential Information." That section expressly instructs employees that they may "not directly or indirectly, disclose, or use for the benefit of any person, firm, corporation or other business organization or yourself, any of the company's confidential information during the course of your employment . . . *or at any time (without limit) after the termination of your employment with Lamb Weston.*"

15. All relevant versions of Lamb Weston's Code of Conduct also advised employees on what constituted "confidential information," including "business plans," "internal programs or practices," "technology and technical data," "research and development information," and "current and future marketing plans," among other things.

16. The Code of Conduct also informed employees that they had a "responsibility to protect [Lamb Weston's] assets against loss, theft and misuse," including "intellectual property" and "confidential information."

17. Because Mercado understood his confidentiality obligations from the time of his onboarding, and completed five trainings on the Code of Conduct, he understood that the Code of Conduct prohibited disclosure of Confidential Information after termination even before he signed the Separation Agreement expressly agreeing that he was obligated not to do so in consideration for his severance benefits. Furthermore, he understood what constituted "Confidential Information."

5

18. Mercado also attended five trainings on Information Security during his employment. These courses required attendees to acknowledge that they reviewed Lamb Weston's Information Security Policy.

19. Lamb Weston's Information Security Policy stated that "[a]ll [employees] are responsible for protecting Lamb Weston's information Assets . . ., intellectual property, proprietary information, and reputation from damage, theft, misuse, or unauthorized use or access."

20. The Information Security Policy also stated that "[a]ll stakeholders must return all the organization's Assets in their possession upon termination of their relationship with Lamb Weston" and "[s]anitize or destroy electronic media and papers that contain sensitive data when no longer needed." The "Assets" referred to in the Information Security Policy included "[a]ll information, whether in physical or electronic form, that is created, collected, or stored in connection with the operation and management of Lamb Weston[.]"

21. Mercado also repeatedly took training on Lamb Weston's plant visitor policy, designed to help protect confidential information regarding the physical layout, types of machinery, and other proprietary information about Lamb Weston's manufacturing facilities.

22. In short, Mercado knew of, received training on, and understood both Lamb Weston's efforts to protect its confidential information, what that confidential information entailed, and his duty to maintain that confidentiality both before and after his tenure at Lamb Weston.

**B. Mercado is Terminated as an Employee and Agrees to a Separation Agreement**

23. Mercado's last day of employment with Lamb Weston was April 23, 2024.

24. Approximately a week before his last day of employment, Mercado learned that Lamb Weston would soon be terminating him.

25. After learning about his impending termination—beginning no later than on April 18, 2024, and continuing until the last day of his employment—Mercado forwarded numerous

6

documents with confidential Lamb Weston information from his Company email account to his personal email account. These emails included "tracking report[s]," which contained highly confidential information about production and run rates over time for several Lamb Weston manufacturing plants (part of the confidential information that Mercado would later disclose during the Interview).

26. On April 23, 2024, his last date of employment, Mercado met with Lamb Weston's Senior Director of Human Resources, Linda Baird. Mercado did not receive significant advance notice of this meeting—the meeting invite was sent shortly before the meeting was to take place. Nonetheless, Mercado arrived to the meeting with his corporate laptop, security badge, and corporate credit card, suggesting that he was aware that the meeting was to result in his termination. And indeed, during this meeting, Mercado stated that he had learned that he was to be terminated from Lamb Weston a week earlier from a third party.

27. During the April 23, 2024 meeting, Mercado also received from Linda Baird a Separation Agreement and General Release ("Separation Agreement"). The Separation Agreement offered Mercado several benefits as consideration in exchange for agreeing to the Separation Agreement's terms, which, among other things, included a Confidentiality Agreement. Lamb Weston did not know about Mercado's surreptitious transfers of confidential Company information at the time it presented him with the Separation Agreement. Had Lamb Weston known about Mercado's improper transfers, it would have acted differently -- it could have terminated Mercado for cause, and certainly would not have offered Mercado the consideration that it provided in the Separation Agreement.

28. Baird advised Mercado during the meeting that he did not need to sign the Separation Agreement immediately but could take time to review the document.

29. Mercado signed the Separation Agreement on May 9, 2024, a representative of Lamb Weston countersigned it on May 13, 2024, and it became effective on May 17, 2024 (the "Effective Date").

30. The consideration Mercado received under the Separation Agreement included several lump sum payments—in total, over $200,000—that covered: (a) 26 weeks of pay, based on his regular salary before termination; (b) a COBRA subsidy to offset the employer portion of healthcare premiums for 26 weeks; and (c) a prorated bonus based on the number of days he was employed at Lamb Weston during the fiscal year.

31. The Separation Agreement also provided that Mercado would receive outstanding equity (stock) awards—a pro rata amount determined according to Lamb Weston's 2016 Stock Plan and subject to the terms of any applicable award agreements. All told, Mercado received over 1,800 shares of Lamb Weston stock in connection with the Separation Agreement and his termination.

32. In exchange for these benefits, Mercado agreed to be bound by the Separation Agreement, which included, among other terms and conditions, a Confidentiality Agreement. By agreeing to the Confidentiality Agreement, Mercado acknowledged that:

> "Lamb Weston has developed and continues to develop and use commercially valuable confidential and/or proprietary . . . information which is vital to the success of Lamb Weston's business, and furthermore, that Lamb Weston utilizes confidential information, trade secrets and proprietary customer information in promoting and selling its products and services."

33. The Confidentiality Agreement required Mercado to agree that he "ha[s] not and will not . . . disclose or use . . . any 'Confidential Information' related to Lamb Weston . . . ."

34. The Separation Agreement defines "Confidential Information" broadly, as follows:

> "'Confidential Information' means Lamb Weston's current and future marketing plans, market positions, strategy, budgets, long-range plans, customer information, sales data and strategies, pricing data and strategies, cost data, formulas, recipes,

8

manufacturing information, research and development information, new product concepts, personnel information[,] privileged information, or other information used by or concerning Lamb Weston, where such information is not publicly available, or has been treated as confidential."

35. The payments and other consideration Mercado was set to receive under the agreement were expressly conditioned on certain promises by Mercado regarding his past and future conduct. Specifically, by executing the Separation Agreement, Mercado agreed that "[a]ny payments under this Agreement are conditioned upon [his] agreement that [he] will return to the Company on or before the Effective Date . . . all files, records, documents, reports, computers, cellular telephones and other business equipment, keys, and other physical, personal, or electronically stored property of the Company in your possession or control."

36. Relatedly, Mercado also agreed that "[a]ny payments under this Agreement are conditioned upon [him] . . . agree[ing] that [he] ha[s] not and will not keep, transfer, or use any copies or excerpts of the foregoing items without the specific approval of [Lamb Weston]."

37. By executing the Separation Agreement, Mercado also agreed that he would "not make or utter any disparaging remarks about [Lamb Weston] . . . and/or communications that in any way disparage or reflect negatively on [Lamb Weston]." The Separation Agreement specified that "[t]his provision applies to all acts or statements that disparage, discredit, or call into disrepute, without regard for the truth or falsehood of the statement and regardless of whether the statement(s) would constitute a claim for defamation."

38. Moreover, the Separation Agreement incorporated Lamb Weston's Code of Conduct by providing that "[i]f Lamb Weston has a reasonable basis to believe you have engaged in behavior in conflict with Lamb Weston's Code of Conduct, or have breached the terms of this Agreement, Lamb Weston may, in addition to any other rights and remedies, withdraw or terminate

9

this agreement; offset any claims against you from any current or future sums, stocks, stock options, or rights which may be due you or in which you may claim an interest."

    **C. Mercado Discloses Confidential Information in an Interview with a Third Party and Fails to Return Company Property in Contravention of the Separation Agreement.**

39. On or around February 3, 2025, Mercado gave the "Interview" with non-party Third Bridge, moderated by Third Bridge "Sector Analyst" John Oh.

40. During the Interview, Mercado made statements that revealed highly confidential information about Lamb Weston, including information about Lamb Weston's market positions, strategy, pricing data and strategies, customer information, and manufacturing information.

41. For example, Mercado disclosed confidential "manufacturing information"—specifically information regarding Lamb Weston's manufacturing facilities, equipment, and capabilities—during the Interview, in direct contravention of the Separation Agreement. These statements included, inter alia, estimates of the percentage of Lamb Weston's manufacturing facilities that were less efficient than competition, opinions on the impact of this nonpublic, confidential information on Lamb Weston's "total operating strategies," statements regarding what Mercado was "able to see" at Lamb Weston regarding the impact of production volumes on Lamb Weston's fixed and variable costs, statements regarding how many of Lamb Weston's operating lines were equipped to accommodate changes in "cut," the impacts of variable demand on Lamb Weston's ability to continue manufacturing at some plants, opinions on specific manufacturing plants' capacity and flexibility, predictions based on Mercado's experience at Lamb Weston of potential plant closings and the timeline for the same, and statements regarding Lamb Weston's "run rates" at its manufacturing facility, the impacts of that on its profitability, and his understanding of how this compared to Lamb Weston's competitors (despite acknowledging that

10

he "did not have information about the competition" in this regard—unsurprising since this is highly confidential information).

42. These disclosures reflected confidential Lamb Weston information that Mercado learned—and only could have known—from his role at Lamb Weston. For example, Mercado's comments regarding the impacts of volume and variable demand on Lamb Weston's manufacturing is information he learned as a consequence of being in charge of demand planning, and because he was privy to reporting on plant capacities, capabilities, and other internal reviews. Likewise, information Mercado disclosed regarding the "flexibility" of Lamb Weston's manufacturing facilities as compared to competitors is information he was privy to only as a result of his role at Lamb Weston and access to internal reports and planning meetings that were not shared publicly and reflected highly confidential internal information.

43. As he admitted in his Answer to Lamb Weston's initial Complaint in this case, Mercado also made several statements during the Interview that disclosed confidential information about Lamb Weston's "market position," "strategy," "long-range plans," and "pricing data and strategies" in direct contravention of his obligations under the Separation Agreement. These statements included, inter alia, disclosures of Lamb Weston's recent pricing strategies and how these compared to Lamb Weston's competitors, and statements regarding Lamb Weston's pricing structures, policies as to customer pickup, and differential treatment of different-size customers.

44. Again, these statements encompassed confidential Lamb Weston information that Mercado knew—and only could have known—because of his role at Lamb Weston, including his access to Lamb Weston's accounts, pricing, and contracts.

45. During the Interview, Mercado also disparaged Lamb Weston's business and reputation and made comments that reflected negatively on it, also in contravention of the

11

Separation Agreement. For example, he stated that his "level of confidence [in Lamb Weston] would be three" out of ten, that he supported an "activist investor group" acquiring the company, and that the company had "very old ways of working" and "a lot of resistance to change."

46. In the Interview, Mercado also made statements that show he failed to return all company property, which was required under the Separation Agreement. Specifically, after being asked if he could "quantify the impact of [Lamb Weston's] lower capacity utilization and its direct impacts on operating costs," Mercado responded that "… maybe in a follow-up call, *I can look into my files and see if there is anything that is available to share with you*." The end of the Interview also invited listeners to contact their relationship manager at Third Bridge to schedule a "private call or meeting" with Mercado.

47. Mercado's statements not only show that he has already breached the Separation Agreement, but they also show a substantial likelihood of future harm to Lamb Weston that warrants permanent injunctive relief (in additional to the preliminary injunctive relief already granted).

48. For example, in the Interview, Mercado expressed a willingness to return for a "follow-up call" with Third Bridge after he "look[ed] into his [Lamb Weston] files" for Confidential Information responsive to a question about Lamb Weston's utilization and operating costs. As noted above, Mercado's "files" include confidential Lamb Weston reports that Mercado surreptitiously forwarded to himself in his last days of employment, which Lamb Weston only discovered by investigating Mercado's email traffic after learning of his public disclosures of Lamb Weston's confidential information.

49. Each day that passes without an injunction that orders Mercado not to further breach the Separation Agreement is another day that Mercado can act on his expressed interest to speak

12

with Third Bridge and its audience again and disclose yet more confidential information relating to Lamb Weston, further injuring Lamb Weston's business.

50. Additionally, Mercado's acknowledged failure to return Lamb Weston property (Company files in his possession), as required under the Separation Agreement and as shown by his brazen emailing to his personal account of confidential Lamb Weston documents, and offer to further discuss this information with third parties, also evidences a real and immediate threat of repeated future harm to Lamb Weston that necessitates injunctive relief.

51. Mercado's actions represent an extreme deviation from reasonable standards of conduct—they were performed with malice and/or oppression, which included Mercado's knowing fraudulent misrepresentations and material omissions to induce Lamb Weston's lump-sum payments and equity (stock) awards—and warrant an assessment of punitive damages against Mercado.

## COUNT ONE
## Breach of Contract

52. Lamb Weston repeats and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

53. The Separation Agreement is a valid contract and, pursuant to that contract, Lamb Weston and Mercado were in a contractual relationship.

54. Under the Separation Agreement, any payments to Mercado were expressly conditioned upon his agreement that he "will return to [Lamb Weston] on or before the Effective Date . . . all files, records, documents, reports, . . . and other . . . property of the Company in [his] possession or control . . . ."

55. Under the Separation Agreement, any payments to Mercado were also expressly conditioned upon Mercado's agreement that he "ha[s] not and will not keep, transfer, or use any

13

copies or excerpts of [Lamb Weston files, records, documents, and reports] without the specific approval of the Company."

56. Lamb Weston performed all of its obligations under the Separation Agreement, including making lump-sum payments to Mercado as specified therein.

57. Mercado breached the Separation Agreement by disclosing Confidential Information related to Lamb Weston in the Interview.

58. Mercado breached the Separation Agreement by not returning Company Property before the Separation Agreement's Effective Date, despite an express obligation to do so and an express provision conditioning any payments on said return.

59. Mercado further breached the Separation Agreement by disparaging the reputation of Lamb Weston and making comments that reflected negatively on it.

60. Lamb Weston was damaged as a direct and proximate result of Mercado's breaches, including but not limited to by virtue of its payment to Mercado of hundreds of thousands of dollars of conditional severance benefits that Mercado was not entitled to, and seeks an award of damages in an amount to be determined at trial.

61. Lamb Weston also seeks a permanent injunction (in addition to the preliminary injunctive relief already granted by the Court) prohibiting Mercado from disclosing Confidential Information and ordering him to return Lamb Weston's property to remedy his ongoing violation of the Separation Agreement and the threat that he will further disclose confidential information. As to these ongoing and threatened future injuries, Lamb Weston lacks an adequate remedy at law.

**COUNT TWO**
**Unfair and Deceptive Trade Practices**

62. Lamb Weston repeats and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

63. Mercado's unauthorized disclosure of Lamb Weston's Confidential Information constitutes an unfair and deceptive act and practice.

64. Mercado's statements on the Interview also constituted unfair or deceptive trade practices because they disparaged the goods, services, or business of Lamb Weston by false or misleading representations of fact.

65. Mercado's actions concern Lamb Weston's business activities, including its manufacturing operations throughout the United States. Therefore, these actions affect interstate commerce.

66. Lamb Weston has been damaged as a direct and proximate result of Mercado's unfair and deceptive acts practice and seeks damages in an amount to be determined at trial.

67. Lamb Weston also seeks permanent injunctive relief (in addition to the preliminary injunctive relief already granted by the Court).

**COUNT THREE**
**Fraud/Fraud in the Inducement**

68. Lamb Weston repeats and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

69. By virtue of his employment with Lamb Weston, and independent from the Separation Agreement, Mercado agreed to Lamb Weston's Code of Conduct, which obligated him to protect Lamb Weston's confidential information; prohibited him from using such information for his own benefit; and required him to safeguard such information from unauthorized disclosure, misuse, loss, or theft.

70. In connection with the Separation Agreement, Mercado expressly represented that he "ha[s] not and will not keep, transfer, or use any copies or excerpts of [Lamb Weston files, records, documents, and reports] without the specific approval of the Company."

15

71. In making this representation, Mercado falsely affirmed his compliance with preexisting duties that he owed to Lamb Weston, attendant to his employment with the Company and his role as an officer of the Company, including but not limited to obligations under Lamb Weston's Code of Conduct.

72. Mercado knew that his representation in the Separation Agreement was false, at least because, beginning no later than April 18, 2024, he transferred numerous documents with confidential Lamb Weston information from his Company email account to his personal email account. He thus acted with scienter in making the false representation that he had not kept or transferred any Lamb Weston files, records, documents, or reports.

73. When Lamb Weston executed the Separation Agreement, it did not know that Mercado's representation was false.

74. Additionally, Mercado had a duty to disclose his failures to protect Lamb Weston's confidential information by virtue of his relationship with Lamb Weston, including by virtue of his role as its Vice President of Global Customer Service, Logistics and Planning. He knew this information was material to Lamb Weston and that his failure to disclose it, separate and apart from his express representations in the Separation Agreement, would materially affect Lamb Weston's behavior.

75. Thus, in addition to his affirmative misrepresentation, Mercado failed to disclose material information to Lamb Weston at the time he entered the Separation Agreement, including that he had previously transferred confidential Lamb Weston information without permission, had plans to disclose Lamb Weston's confidential information, and had plans to disparage and/or make negative comments about Lamb Weston.

16

76. Mercado intended Lamb Weston to act on his false representation and/or omission by, among other things, executing the Separation Agreement and remitting the consideration specified therein.

77. Lamb Weston was justified in relying on Mercado's misrepresentation and/or omission when it executed the Separation Agreement and remitted the consideration specified therein.

78. Mercado's misrepresentation and/or omission induced Lamb Weston to enter the Separation Agreement and to provide more benefits to Mercado as consideration thereunder than it would have had it known the truth.

79. Lamb Weston was damaged as a direct and proximate result of Mercado's fraudulent misrepresentation and/or omission, including but not limited to by virtue of its payment to Mercado of hundreds of thousands of dollars of severance benefits to which Mercado was not entitled, and seeks an award of damages in an amount to be determined at trial.

80. Lamb Weston also seeks permanent injunctive relief.

## COUNT FOUR
### Unjust Enrichment (In the Alternative)

81. Lamb Weston repeats and incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein, except those allegations concerning the Separation Agreement's enforceability for purposes of this alternative claim.

82. In his Answer to Lamb Weston's initial Complaint, Mercado asserts an affirmative defense that the Separation Agreement "is overly broad and unenforceable in several respects" (Mercado mistakenly refers to the "Settlement Agreement" in this paragraph of his Answer, but in context it appears clear that he is referring to the Separation Agreement).

83. Lamb Weston disagrees with the assertion that the Separation Agreement is unenforceable in any respect. However, in the alternative to Count One, and to the degree that the Separation Agreement is found unenforceable, Lamb Weston seeks to recover in equity due to the unjust enrichment that inured to Mercado as a result of his wrongdoing.

84. Lamb Weston conferred a benefit on Mercado by providing him with several lump-sum payments as well as equity (stock) awards in connection with his termination from the Company.

85. Mercado accepted the benefit, but failed to return all Company property, failed to keep Company information confidential, fraudulently induced Lamb Weston's payment and/or provision of such benefits, and made disparaging remarks about Lamb Weston.

86. Under the circumstances alleged herein, it would be inequitable for Mercado to retain the benefits Lamb Weston conferred upon him in connection with his termination, and he has thus been unjustly enriched by retaining these benefits.

87. Lamb Weston is entitled to recover the value of the payments made to Mercado and seeks an award of damages in an amount to be determined at trial.

88. Lamb Weston also seeks permanent injunctive relief.

**PRAYER FOR RELIEF**

89. WHEREFORE, Lamb Weston prays for the following relief:

A. Damages in favor of Lamb Weston in an amount to be determined at trial, as well as pre-judgment interest, attorneys' fees, and costs, and treble, punitive, or other exemplary damages as permitted by law;

B. A temporary restraining order and preliminary injunction (to the extent that the already pending preliminary injunction against Mercado is lifted for any reason), and permanent injunction; and

C. Such further and other legal and equitable relief as the Court may deem just and proper.

**WINSTON & STRAWN LLP**

Dated: May 19, 2025     By: /s/ *Amanda L. Groves*
Amanda L. Groves
N.C. Bar No.: 44993
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Tel.: (213) 615-1851
Email: AGroves@winston.com

Jeff Wilkerson
N.C. Bar No.: 51209
300 S. Tryon Street, 16th Floor
Charlotte, NC 28202
Tel.: (704) 350-7714
Email: JWilkerson@winston.com

19

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 19, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will cause notification of the filing to be sent to all parties of record.

Dated: May 19, 2025

                                            /s/ *Amanda L. Groves*
                                            Amanda L. Groves